## STATE OF FLORIDA v. LITTLEFIELD
### No. 82-165468-TT A04
County Court, Palm Beach County
November 14, 1983

Jim Conolly, for plaintiff.

Ken Stearn, for defendant.

JAMES T. CARLISLE, County Judge

The issue in these cases is whether a failure to preserve a sample of defendant's breath for purposes of independent testing by defendant is a denial of due process. I hereby adopt the opinion of Judge Stephen Dakan of the Circuit Court of the Twelfth JudicialCircuit for Sarasota County in *Cook vs. Florida*, [2 Fla. Supp 2d 184] case number 80-1276-AP-01, *State v. Martin*, [1 Fla. Supp 2d 159] case number 998-943V in the County Court of Hillsborough County, dated November 30, 1981, and *State vs. Castignoli*, case number 82-25998-TT 10, by Judge Kay of Broward County, dated April 6, 1983. These cases hold that it is essential under due process principles for the defendant to be afforded a sample of his breath for future testing when the State intends to use an analysis of the alcohol content thereof against him at trial.

I do so because there are already in existence scientifically reliable systems available for collecting and preserving breath samples for future testing at modest expense. At least one of these systems, the Indium Crimper, used in conjunction with a GCI Intoxilyzer, has been approved by the Department of Health and Rehabilitation Services. See Chapter 10 D-42.24(5). There is no need for further evidence of reliability because that Department is charged with testing and approving for reliability, *Bender v. State*, (Fla. S.Ct.) 382 So.2d 697. Finally, in each of the above cases cited there was ample expert testimony supporting those courts' conclusions.

There are a number of cases dealing with the duty to collect preserve and disclose evidence. Any consideration of the legal issues involved in this question must begin with *Brady v. Maryland*, 373 US 83, 10 L.Ed 2s 215, 83 S.Ct 1194 (1963). There a confession of a co-defendant, admitting the actual murder, was withheld from Brady despite his request to examine the co-defendant's extra judicial statements. Mr. Justice Douglas for the majority stated as follows:

"We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.

"The principle of Mooney v. Holohan is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription of the walls of the Department of Justice states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' A prosecution that withholds evidence on demand of an accused which, if made

available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not 'the result of guile,' to use the words of the Court of Appeals, 226 Md, at 427."

(10 L.Ed 2d at 218, 219.)

In *U.S. v. Agurs*, 427 US 97, 49 L.Ed 2d 342, 96 S.Ct 2392 (1976), it was held the fourteenth Amendment requires a prosecutor to provide defendant with any material exculpatory matter.

"Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, *the prudent prosecutor will resolve doubtful questions in favor of disclosure.*

*U.S. v. Bryant* (DC Circuit 1971) 439 Fed 2d 642, involved the government's loss of tape recordings of conversations between defendant and government agents which would have shown defendant's participation in a narcotics transaction. The court held the government had a duty to show it had used "rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation.".[1] (Page 652.) The Court held: "The duty of disclosure is operative as a duty of preservation." (Page 651.) See also *Government of Virgin Islands v. Testamark* (3rd Circuit 1978) 570 Fed 2d 1162, 1166.

---

[1] In *People v. Palmer*, Colorado Court of Appeals, 652 P.2d 1029 (1982), Palmer argued that he was merely a procuring agent rather than a drug seller. He contended the court erred when it allowed police officers to testify concerning conversations between himself and an informant, which they intercepted but did not record. He argued the failure to record is analogous to the State's failure in Garcia (infra) to preserve separate breath samples for defendant's use. The Colorado Court drew a distinction between the failure to record a conversation and the failure to preserve a breath sample which I am not at all sure can bear analysis. The Court noted the results of the breath created no presumption of guilt and did not relieve the State of its burden to prove guilt on all issues. Palmer's participation in the conversation enabled him to dispute the police version of the conversation and was not impaired by the failure to supply him with a recording of it.

That distinction cannot stand in the face of *Bryant*, supra, Harmes and *Feland*, both *infra.*

I suspect that where it is shown the technology and opportunity to record and/or preserve exists, there may well be a constitutional duty to do so.

Certainly the result would be no different in *Harmes*, supra, if the police had failed to turn on the video camera.

The Supreme Court of California in *People v. Moore*, 34 C.3d 215, (August 1, 1983), in a violation of probation case, held failure to preserve a urine sample, which has been tested for the presence of PCP, was denial of due process. ". . . There exists a reasonable possibility that independent testing of the urine sample in this case could yield results that would undermine the prosecution's case."

In *People v. Harmes*, Colorado Court of Appeals, 560 P.2d 470 (1976), Harmes was convicted of assault. The assault took place, in part, at the police station after he had been arrested. Harmes claimed the officer struck him without justification and that he only used his feet in an attempt to fend off the officer's blows.

The incident at the police station was video taped. Unfortunately, the tape was erased and reused by the police. On that ground Harmes moved for dismissal. In reversing Harmes' conviction the court stated:

"The duty of preserve evidence known to be material is part of the duty to disclose. (Citation omitted.) The principle underlying this rule is the constitutional process. The focus, therefore, is not upon the existence or the extent of any culpability by the authorities in failing to preserve clearly material evidence, a matter not generally susceptible of proof by defendant. (Citing *Agurs*, supra.) Rather, it is directed at the affect that the loss of the particular item of evidence has on defendant's ability to defend against the criminal charges. (Citing *Brady*, supra.) Thus, although it may be questionable terminology to label cases involving negligent loss or destruction of critical evidence as instances of 'suppression', the effect of non-availability to the defendant is at least as damaging under these circumstances as it is in cases involving intentional non-disclosure.

"Where, as here, crucial material evidence is wholly destroyed by the prosecution, and the responsibility for such destruction cannot properly be imputed to the defense, any requirement that the defendant somehow demonstrate that the evidence was exculpatory, becomes an absurdity, and is not imposed."

In *People ex rel Gallagher*, Supreme Court of Colorado, 656 P.2d 1287 (January 31, 1983), one Reynolds was charged with first degree murder of his wife. His theory of defense was that the gun discharged during a struggle in which he was attempting to defend himself against an attack by his wife. At the crime scene a deputy district attorney asked Officer Garbett to obtain a trace metal test on the victim's hands. Defense also requested such a test and asked that the victim's hands be covered with plastic bags until the analysis could be accomplished. This was done. At some point the bags were removed and the hands scrubbed by a mortician. The evidence reflected that if the tests had been performed

there was a four percent possibility of definite evidence that the wife had held a particular weapon. The court held the four percent possibility was too significant to ignore. The court further held that while not a case where the prosecution failed or refused to furnish existing exculpatory evidence, nevertheless when evidence can be collected and preserved in the performance of routine procedures by state agents, failure to do so is tantamount to suppression of evidence, and the state must employ regular procedures to preserve evidence which a state agent, in the regular performance of routine procedures, could reasonably foresee might be favorable to the accused.

In *Seattle v. Feland*, 519 P.2d 1002 (1974), the police negligently destroyed a video tape of Feland's performance of standard co-ordination and balancing tests at the time of arrest. It was there held that the loss of the video tape amounted to a denial of due process.

In *State v. Brown*, Supreme Court of Iowa (August 17, 1983) 337 NW 2d 507, a blood sample was taken from Brown following an accident involving a fatality. The blood was not preserved for independent testing. The Iowa Court found failure to preserve the blood was a denial of due process.

*Stipp v. State*, 371 So.2d 712 (1979 4DCA), was a trial for possession of cocaine. Stipp moved to suppress on the ground that he was prevented from having the cocaine tested by his own expert. The substance had been inadvertently destroyed. There was testimony from the state chemist that it was not necessary to destroy the entire amount in order to perform the tests. In reversing Stipp's conviction the court stated as follows:

"It is wrong for the State to unnecessarily destroy the most critical inculpatory evidence in its case against an accused and then be allowed to introduce essentially irrefutable testimony of the most damaging nature against the accused. It is wrong because it violates a most fundamental right of due process, constitutionally mandated in Florida and the United States . . ."

There are any number of cases dealing with the question of preservation of breathalyzer ampules. This issue is the subject of an annotation, 19 ALR 4th 510. In view of the State approved device capable of collecting and preserving a breath sample there is, in my view, little need to consider this issue. Ampule preservation, if possible, leaves us only with the footprints. We may speculate on the nature of the beast that left the prints. We may agree or disagree with another person's concept of the beast, based on the footprints. Collecting and preserving an independent sample of the substance tested presents us with the beast itself. We may count his scales and measure his tooth and claw.

Turning now to the question of breath preservation, in *State v. Shutt*, 363 A.2d 406 (1976), the Supreme Court of New Hampshire held there was no duty on the State to perform an additional breath test for the defendant's personal use and there was no denial of due process. In *State v. Cornelius*, 425 A.2d 464 (1982), the same court stated as follows:

> "The evidence before us indicates that since Shutt was decided, advances in technology have occurred, making it possible for the state, at reasonable expense, to make and preserve an additional breath sample or its functional equivalent, for the defendant's later use, and for information of some value to be obtained from 'used' ampules. We are not prepared, however, to conclude that a statute and the procedures employed in its implementation, which passed constitutional muster in 1976, have because of these technological advances become constitutionally infirm in 1982. It is sufficient to emphasize that as technological advances occur, the use of which by law enforcement authorities will better enable the state to make more meaningful and real the rights guaranteed citizens under our constitutions, the dictates of basic fairness may require that the state avail itself of such technology."

Incredibly enough the court affirmed. Justice Douglas concurring specially would have overruled Shutt prospectively. Justice Batchelder and Chief Justice King dissented.

In *Garcia v. The District Court, 21st Judicial District of the State of Colorado*, Supreme Court of Colorado (January 22, 1979), 589 P.2d 924, it was held:

> "The failure of the state to collect and preserve evidence, when those acts can be accomplished as a mere incident to a procedure routinely performed by state agents, is tantamount to suppression of that evidence. It is incumbent upon the state to employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties, could reasonably foresee 'might' be 'favorable' to the accused . . . We hold, therefore, that in all cases where the defendant elects to submit to a breath test to determine his blood alcohol level, he must be given a separate sample of his breath at the time of the test if that test is to be used as evidence."

In *Baca v. Smith*, Supreme Court of Arizona, 604 P.2d 617 (November 27, 1979), it was held:

> "The right to test incriminating evidence where the evidence is completely destroyed by testing becomes all the more important because the defense has little or no recourse to alternate scientific

means of contesting the test results, and, therefore, when requested, the police must take and preserve a separate (breath) sample for the suspect by means of a field collection unit.''

In 1981 the Legislature of the State of Vermont enacted Title 23, Section 1203(a) which requires the preservation of an independent breath sample.

In *Municipality of Anchorage v. Serrano*, Court of Appeals of Alaska, 649 P.2d 256 (August 6, 1982), it was held:

"Due process does require the state and the municipality to take reasonable steps to attempt to preserve breath samples for defendants for their independent analysis or to provide some other alternative check of the breathalyzer results. The evidence presented at the hearings which were held in these cases indicated that a breath sample could be highly material. The evidence presented below established that the operation of the breathalyzer machine is dependent upon the proper performance of critical functions by the operator. A breath sample would help to provide a check on possible operator error and would provide a means of assuring that the breathalyzer mechanical components were not malfunctioning. A breath sample would also provide a means of determining whether the test results were in any way affected by the breathalyzer's inherent inaccuracy. By making it an offense to operate a car with a certain level of blood or breath alcohol, the current state statute and the city ordinance both place great emphasis on the breath test. The ability of the defendant to cross-examine this test is critical to his case and to the integrity of the criminal justice system.''

In *People v. Trombetta*, California Court of Appeals, 142 C.A.3d 138 (June 23, 1983), it was held that failure to preserve a breath sample amounts to a denial of due process. See also *People v. Shepherd*, (New York) 118 Misc. 2d 365 (March 1983).

Failure to preserve the independent sample allows the state to introduce irrefutable testimony of the most damaging nature. The defendant is forced into a swearing match in which he pits his credibility against uniformed police officers. At the very minimum there is the arresting officer and the breathalyzer operator. The defendant is usually alone. The defendant does not know how to operate a breathalyzer machine and any suggestion he makes that the tests were improperly administered is at once discounted by the suggestion that he would not know if the tests were properly administered and, in any case, the defendant was in no condition to notice. This state of affairs cannot be allowed where, with minimal effort and expense, the defendant could be provided with evidence which might refute the testimony of the state's witnesses.

It is also argued the provision of Section 316.1932, Florida Statutes, which provides an accused may, at his own expense, obtain an independent test in addition to the test administered at the direction of law enforcement officers can be substituted for the requirement of an independent sample. The so-called right to an independent test required by Florida Statute is largely illusory. A great deal of time can elapse after an arrest. The individual must be taken to some place for the purpose of breath testing, and then transported to the jail. The booking procedure can take considerable time, depending of whether there are other persons waiting to be booked. Some further time might elapse arranging for bail in the event there are not sufficient ties to the community. Finally, it would be rather difficult to convince an emergency room physician to take the time to administer the independent test. I doubt we want to impose the duty on police officers to transport arrested persons around the county in a futile effort to secure an independent test. I think in most cases alcohol in the person's blood will have dissipated by the time they obtain an independent test, making it worthless.

Not presently before me but certainly an analogous or collorary issue, is whether failure to obtain a video tape of a defendant taking sobriety tests and being interviewed is likewise a denial of due process. The equipment for making this record is readily available. Indeed, it can be purchased by laymen in major department stores. The Sheriff's Office presently operates three Batmobiles which are used for this very purpose. The reasoning which leads to the conclusion that failure to preserve a breath sample amounts to a denial of due process leads inevitably to the conclusion that failure to make this record is a denial of due process.

The practice of video taping DWI has resulted in a significant increase in the conviction rate. The courts' work load has been decreased because persons who might be disposed to take their chances with a jury are often persuaded to plead guilty after seeing themselves on tape and learning the jury will be shown that tape. The fact remains, there have been a number of acquittals where the tape casts doubt on the credibility of the officers. If what we are about is a search for the truth we are aided in that search by the video tape.

I am informed the number of jury DWI trails in Hillsborough County has decreased significantly since *State v. Martin*, supra. I am told that upon learning the results of an independent test of the breath sample corroborates the tests performed by the police, many defendants are pleading guilty.

The Department of Health and Rehabilitative Services has approved as reliable both the Indium Crimper and the Intoxilyzer. A person suspected of DWI is asked to blow through a mouth piece connected to a crimping machine. The breath passes through a short length of indium tubing. At the proper time, which is at the end of the exhalation, a handle attached to a crimper device is closed, crimping the indium tube into three separate compartments and sealing off three specimens of the last breath to leave the person's lungs. One of these samples can be furnished the suspect. At a later time these indium containers can be placed in a gas chromotograph device which will test the sample of blood alcohol content.

The use of that system presents significant advantages in the detection of DWI as well as providing an independent sample to the defentant. The crimping device is relatively inexpensive—less than $400.00. It can be operated from the cigarette lighter of a patrol car. It is thus possible to secure a breath sample shortly after stopping a suspected DWI. The breath sample can be collected at the scene of the arrest. A patrol car, equipped with a video camera, available at any major department store, could also record the condition of a person arrested at the scene.[2]

Because of the crimper's ability to preserve and store breath samples for a long period of time, there is no need to immediately determine the alcohol content of the breath. There is less need for expensive breath testing equipment. Likewise, the necessity of training many officers as breathalyzer operators is removed. Only eight hours of training is necessary for crimper operators as compared with forty hours for breathalyzer operators.

My informal discussions with persons who have served on juries in DWI cases leads me to believe they have an inherent suspiciion that breathalyzer operators shade their testimony to support the arrest of a fellow officer. The fact that capsules of breath can be stored dispels this suspicion. That capability also eliminates the possibility of the test results being affected by a personality conflict between the testing officer and the suspect. The person who does the testing can be attenuated

---

[2]The capability of obtaining a breath sample as close as possible to the time of arrest is important in dealing with the "peaking defense," in which the defendant testifies he consumed a large quantity of alcohol just prior to the accident or arrest. The argument is that the alcohol has not had time to enter the blood stream and had the defendant not been involved in an accident or arrest he would have been home in bed when it did so. When, considerably later, the breath sample is taken, this defense is often irrefutable. Because of the "peaking defense" two breath samples should be taken. After a roadside breath sample is secured the arrested person could be taken to some convenient place where a second sample is taken, sobriety tests administered and the defendant interviewed.

from the arresting officer and the defendant as to dispel that suspicion. In fact, there is no need that the person even be a police officer.

Being a breathalyzer operator is not considered a good job with most police departments. The work requires additional schooling. It requires the officer to be available at ungodly hours. It requires him to respond for the purposes of administering tests to some very unpleasant people. Additionally, he spends many hours in court waiting to testify. The duty greatly interefers with his personal life. Consequently, not many officers are anxious to remain proficient and not many of them are able to stand up to vvigorous cross-examination.

On the other hand, if all that was required was testing and testimony, these matters could be accomplished during normal working hours. Surely persons with background in chemistry and physiology can be secured to perform these tasks. By reason of their training, background, and experience, these people are able to give a better account of themselves on the witness stand than a police officer whose real interest is cops and robbers. Because of the ability to store breath samples, it is possible to set up a breath testing unit, not connected to any law enforcement agency.

It is therefore:

ORDERED AND ADJUDGED the evidence in these cases is suppressed.